(Slip Opinion)  OCTOBER TERM, 2011  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DORSEY *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–5683.  Argued April 17, 2012—Decided June 21, 2012*

Under the Anti-Drug Abuse Act (1986 Drug Act), the 5- and 10-year mandatory minimum prison terms for federal drug crimes reflected a 100-to-1 disparity between the amounts of crack cocaine and powder cocaine needed to trigger the minimums.  Thus, the 5-year minimum was triggered by a conviction for possessing with intent to distribute 5 grams of crack cocaine but 500 grams of powder, and the 10-year minimum was triggered by a conviction for possessing with intent to distribute 50 grams of crack but 5,000 grams of powder.  The United States Sentencing Commission—which is charged under the Sentencing Reform Act of 1984 with writing the Federal Sentencing Guidelines—incorporated the 1986 Drug Act's 100-to-1 disparity into the Guidelines because it believed that doing so was the best way to keep similar drug-trafficking sentences proportional, thereby satisfying the Sentencing Reform Act's basic proportionality objective.  The Fair Sentencing Act, which took effect on August 3, 2010, reduced the disparity to 18-to-1, lowering the mandatory minimums applicable to many crack offenders, by increasing the amount of crack needed to trigger the 5-year minimum from 5 to 28 grams and the amount for the 10-year minimum from 50 to 280 grams, while leaving the powder cocaine amounts intact.  It also directed the Sentencing Commission to make conforming amendments to the Guidelines "as soon as practicable" (but no later than 90 days after the Fair Sentencing Act's effective date).  The new amendments became effective on November 1, 2010.

In No. 11−5721, petitioner Hill unlawfully sold 53 grams of crack in

———————

*Together with No. 11–5721, *Hill* v. *United States,* also on certiorari to the same court.

2007, but was not sentenced until December 2010. Sentencing him to the 10-year minimum mandated by the 1986 Drug Act, the District Judge ruled that the Fair Sentencing Act's 5-year minimum for selling that amount of crack did not apply to those whose offenses were committed before the Act's effective date. In No. 11−5683, petitioner Dorsey unlawfully sold 5.5 grams of crack in 2008. In September 2010, the District Judge sentenced him to the 1986 Drug Act's 10-year minimum, finding that it applied because Dorsey had a prior drug conviction and declining to apply the Fair Sentencing Act, under which there would be no mandated minimum term for an amount less than 28 grams, because Dorsey's offense predated that Act's effective date. The Seventh Circuit affirmed in both cases.

*Held:* The Fair Sentencing Act's new, lower mandatory minimums apply to the post-Act sentencing of pre-Act offenders. Pp. 10−20.

(a) Language in different statutes argues in opposite directions. The general federal saving statute (1871 Act) provides that a new criminal statute that "repeal[s]" an older criminal statute shall not change the penalties "incurred" under that older statute "unless the repealing Act shall so expressly provide." 1 U. S. C. §109. The word "repeal" applies when a new statute simply diminishes the penalties that the older statute set forth, see *Warden* v. *Marrero*, 417 U. S. 653, 659−664, and penalties are "incurred" under the older statute when an offender becomes subject to them, *i.e.,* commits the underlying conduct that makes the offender liable, see *United States* v. *Reisinger*, 128 U. S. 398, 401. In contrast, the Sentencing Reform Act says that, regardless of when the offender's conduct occurs, the applicable sentencing guidelines are the ones "in effect on the date the defendant is sentenced." 18 U. S. C. §3553(a)(4)(A)(ii).

Six considerations, taken together, show that Congress intended the Fair Sentencing Act's more lenient penalties to apply to offenders who committed crimes before August 3, 2010, but were sentenced after that date. First, the 1871 saving statute permits Congress to apply a new Act's more lenient penalties to pre-Act offenders without expressly saying so in the new Act. The 1871 Act creates what is in effect a less demanding interpretive requirement because the statute "cannot justify a disregard of the will of Congress as manifested, either expressly or by necessary implication, in a subsequent enactment." *Great Northern R. Co.* v. *United States,* 208 U. S. 452, 465. Hence, this Court has treated the 1871 Act as setting forth an important background principle of interpretation that requires courts, before interpreting a new criminal statute to apply its new penalties to a set of pre-Act offenders, to assure themselves by the "plain import" or "fair implication" of the new statute that ordinary interpretive considerations point clearly in that direction. Second, the Sen-

tencing Reform Act sets forth a special and different background principle in §3553(a)(4)(A)(ii), which applies unless *ex post facto* concerns are present. Thus, new, lower Guidelines amendments apply to offenders who committed an offense before the adoption of the amendments but are sentenced thereafter. Third, language in the Fair Sentencing Act implies that Congress intended to follow the Sentencing Reform Act's special background principle here. Section 8 of the Fair Sentencing Act requires the Commission to promulgate conforming amendments to the Guidelines that "achieve consistency with other guideline provisions and applicable law." Read most naturally, "applicable law" refers to the law as changed by the Fair Sentencing Act, including the provision reducing the crack mandatory minimums. And consistency with "other guideline provisions" and with prior Commission practice would require application of the new Guidelines amendments to offenders who committed their offense before the new amendments' effective date but were sentenced thereafter. Fourth, applying the 1986 Drug Act's old mandatory minimums to the post-August 3 sentencing of pre-August 3 offenders would create sentencing disparities of a kind that Congress enacted the Sentencing Reform Act and the Fair Sentencing Act to prevent. Fifth, not to apply the Fair Sentencing Act would do more than preserve a disproportionate status quo; it would make matters worse by creating new anomalies—new sets of disproportionate sentences—not previously present. That is because sentencing courts must apply the new Guidelines (consistent with the Fair Sentencing Act's new minimums) to pre-Act offenders, and the 1986 Drug Act's old minimums would trump those new Guidelines for some pre-Act offenders but not for all of them. Application of the 1986 Drug Act minimums to pre-Act offenders sentenced after the new Guidelines take effect would therefore produce a set of sentences at odds with Congress' basic efforts to create more uniform, more proportionate sentences. Sixth, this Court has found no strong countervailing considerations that would make a critical difference. Pp. 10–19.

(b) The new Act's lower minimums also apply to those who committed an offense prior to August 3 and were sentenced between that date and November 1, 2010, the effective date of the new Guidelines. The Act simply instructs the Commission to promulgate new Guidelines "as soon as practicable" (but no later than 90 days after the Act took effect), and thus as far as Congress was concerned, the Commission might have promulgated those Guidelines to be effective as early as August 3. In any event, courts, treating the Guidelines as advisory, possess authority to sentence in accordance with the new minimums. Finally, applying the new minimums to all who are sentenced after August 3 makes it possible to foresee a reasonably smooth tran-

Syllabus

sition, and this Court has no reason to believe Congress would have wanted to impose an unforeseeable, potentially complex application date. Pp. 19−20.

No. 11−5683, 635 F. 3d 336, and No. 11−5721, 417 Fed. Appx. 560, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 11–5683 and 11–5721

---

EDWARD DORSEY, SR., PETITIONER
11–5683       *v.*
UNITED STATES


COREY A. HILL, PETITIONER
11–5721       *v.*
UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 21, 2012]

JUSTICE BREYER delivered the opinion of the Court.

Federal statutes impose mandatory minimum prison sentences upon those convicted of federal drug crimes. These statutes typically base the length of a minimum prison term upon the kind and amount of the drug involved. Until 2010, the relevant statute imposed upon an offender who dealt in powder cocaine the same sentence it imposed upon an offender who dealt in one one-hundredth that amount of crack cocaine. It imposed, for example, the same 5-year minimum term upon (1) an offender convicted of possessing with intent to distribute *500* grams of powder cocaine as upon (2) an offender convicted of possessing with intent to distribute *5* grams of crack.

In 2010, Congress enacted a new statute reducing the crack-to-powder cocaine disparity from 100-to-1 to 18-to-1. Fair Sentencing Act, 124 Stat. 2372. The new statute took

effect on August 3, 2010. The question here is whether the Act's more lenient penalty provisions apply to offenders who committed a crack cocaine crime before August 3, 2010, but were not sentenced until after August 3. We hold that the new, more lenient mandatory minimum provisions do apply to those pre-Act offenders.

I

The underlying question before us is one of congressional intent as revealed in the Fair Sentencing Act's language, structure, and basic objectives. Did Congress intend the Act's more lenient penalties to apply to pre-Act offenders sentenced after the Act took effect?

We recognize that, because of important background principles of interpretation, we must assume that Congress did *not* intend those penalties to apply unless it clearly indicated to the contrary. See *infra,* at 10–13. But we find that clear indication here. We rest our conclusion primarily upon the fact that a contrary determination would seriously undermine basic Federal Sentencing Guidelines objectives such as uniformity and proportionality in sentencing. Indeed, seen from that perspective, a contrary determination would (in respect to relevant groups of drug offenders) produce sentences less uniform and more disproportionate than if Congress had not enacted the Fair Sentencing Act at all. See *infra,* at 14–18.

Because our conclusion rests upon an analysis of the Guidelines-based sentencing system Congress has established, we describe that system at the outset and include an explanation of how the Guidelines interact with federal statutes setting forth specific terms of imprisonment.

A

The Guidelines originate in the Sentencing Reform Act of 1984, 98 Stat. 1987. That statute created a federal Sentencing Commission instructed to write guidelines that

judges would use to determine sentences imposed upon offenders convicted of committing federal crimes. 28 U. S. C. §§991, 994. Congress thereby sought to increase transparency, uniformity, and proportionality in sentencing. United States Sentencing Commission (USSC or Commission), Guidelines Manual §1A1.3, p. 2 (Nov. 2011) (USSG); see 28 U. S. C. §§991(b)(1), 994(f).

The Sentencing Reform Act directed the Commission to create in the Guidelines categories of offense behavior (*e.g.,* "'bank robbery/committed with a gun/$2500 taken'") and offender characteristics (*e.g.,* "one prior conviction"). USSG §1A1.2, at 1; see 28 U. S. C. §§994(a)–(e). A sentencing judge determines a Guidelines range by (1) finding the applicable offense level and offender category and then (2) consulting a table that lists proportionate sentencing ranges (*e.g.,* 18 to 24 months of imprisonment) at the intersections of rows (marking offense levels) and columns (marking offender categories). USSG ch. 5, pt. A, Sentencing Table, §§5E1.2, 7B1.4; see also §1A1.4(h), at 11. The Guidelines, after telling the judge how to determine the applicable offense level and offender category, instruct the judge to apply the intersection's range in an ordinary case, but they leave the judge free to depart from that range in an unusual case. See 18 U. S. C. §3553(b); USSG §§1A1.2, at 1–2, 1A1.4(b), at 6–7. This Court has held that the Guidelines are now advisory. *United States* v. *Booker*, 543 U. S. 220, 245, 264 (2005); see *Kimbrough* v. *United States*, 552 U. S. 85, 91 (2007).

The Guidelines determine most drug-crime offense levels in a special way. They set forth a Drug Quantity Table (or Table) that lists amounts of various drugs and associates different amounts with different "Base Offense Levels" (to which a judge may add or subtract levels depending upon the "specific" characteristics of the offender's behavior). See USSG §2D1.1. The Table, for example, associates 400 to 499 grams of powder cocaine with a base

offense level of 24, a level that would mean for a first-time offender a prison term of 51 to 63 months. §2D1.1(c).

In 1986, Congress enacted a more specific, drug-related sentencing statute, the Anti-Drug Abuse Act (1986 Drug Act), 100 Stat. 3207. That statute sets forth mandatory minimum penalties of 5 and 10 years applicable to a drug offender depending primarily upon the kind and amount of drugs involved in the offense. See 21 U. S. C. §§841(b)(1) (A)–(C) (2006 ed. and Supp. IV). The minimum applicable to an offender convicted of possessing with intent to distribute 500 grams or more of powder cocaine is 5 years, and for 5,000 grams or more of powder the minimum is 10 years. §§841(b)(1)(A)(ii), (B)(ii). The 1986 Drug Act, however, treated crack cocaine crimes as far more serious. It applied its 5-year minimum to an offender convicted of possessing with intent to distribute only 5 grams of crack (as compared to 500 grams of powder) and its 10-year minimum to one convicted of possessing with intent to distribute only 50 grams of crack (as compared to 5,000 grams of powder), thus producing a 100-to-1 crack-to-powder ratio. §§841(b)(1)(A)(iii), (B)(iii) (2006 ed.).

The 1986 Drug Act, like other federal sentencing statutes, interacts with the Guidelines in an important way. Like other sentencing statutes, it trumps the Guidelines. Thus, ordinarily no matter what the Guidelines provide, a judge cannot sentence an offender to a sentence beyond the maximum contained in the federal statute setting forth the crime of conviction. Similarly, ordinarily no matter what range the Guidelines set forth, a sentencing judge must sentence an offender to at least the minimum prison term set forth in a statutory mandatory minimum. See 28 U. S. C. §§994(a), (b)(1); USSG §5G1.1; *Neal* v. *United States*, 516 U. S. 284, 289–290, 295 (1996).

Not surprisingly, the Sentencing Commission incorporated the 1986 Drug Act's mandatory minimums into the first version of the Guidelines themselves. *Kimbrough,*

*supra*, at 96–97.  It did so by setting a base offense level for a first-time drug offender that corresponded to the lowest Guidelines range above the applicable mandatory minimum.  USSC, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 53–54 (Oct. 2011) (2011 Report).  Thus, the first Guidelines Drug Quantity Table associated 500 grams of powder cocaine with an offense level of 26, which for a first-time offender meant a sentencing range of 63 to 78 months (just above the 5-year minimum), and it associated 5,000 grams of powder cocaine with an offense level of 32, which for a first-time offender meant a sentencing range of 121 to 151 months (just above the 10-year minimum).  USSG §2D1.1 (Oct. 1987).  Further reflecting the 1986 Drug Act's 100-to-1 crack-to-powder ratio, the Table associated an offense level of 26 with 5 grams of crack and an offense level of 32 with 50 grams of crack.  *Ibid.*

  In addition, the Drug Quantity Table set offense levels for small drug amounts that did not trigger the 1986 Drug Act's mandatory minimums so that the resulting Guidelines sentences would remain proportionate to the sentences for amounts that did trigger these minimums.  2011 Report 54.  Thus, the Table associated 400 grams of powder cocaine (an amount that fell just below the amount triggering the 1986 Drug Act's 5-year minimum) with an offense level of 24, which for a first-time offender meant a sentencing range of 51 to 63 months (the range just below the 5-year minimum).  USSG §2D1.1 (Oct. 1987).  Following the 100-to-1 crack-to-powder ratio, the Table associated four grams of crack (an amount that also fell just below the amount triggering the 1986 Drug Act's 5-year minimum) with an offense level of 24.  *Ibid.*

  The Commission did this not because it necessarily thought that those levels were most in keeping with past sentencing practice or would independently have reflected a fair set of sentences, but rather because the Commission

believed that doing so was the best way to keep similar drug-trafficking sentences proportional, thereby satisfying the Sentencing Reform Act's basic "proportionality" objective. See *Kimbrough*, 552 U. S., at 97; USSG §1A1.3 (Nov. 2011); 2011 Report 53–54, 349, and n. 845. For this reason, the Commission derived the Drug Quantity Table's entire set of crack and powder cocaine offense levels by using the 1986 Drug Act's two (5- and 10-year) minimum amounts as reference points and then extrapolating from those two amounts upward and downward to set proportional offense levels for other drug amounts. *Ibid.*

B

During the next two decades, the Commission and others in the law enforcement community strongly criticized Congress' decision to set the crack-to-powder mandatory minimum ratio at 100-to-1. The Commission issued four separate reports telling Congress that the ratio was too high and unjustified because, for example, research showed the relative harm between crack and powder cocaine less severe than 100-to-1, because sentences embodying that ratio could not achieve the Sentencing Reform Act's "uniformity" goal of treating like offenders alike, because they could not achieve the "proportionality" goal of treating different offenders (*e.g.,* major drug traffickers and low-level dealers) differently, and because the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences. *Kimbrough, supra,* at 97–98; see, *e.g.,* USSC, Special Report to the Congress: Cocaine and Federal Sentencing Policy 197–198 (Feb. 1995) (1995 Report); USSC, Special Report to Congress: Cocaine and Federal Sentencing Policy 8 (Apr. 1997) (1997 Report); USSC, Report to Congress: Cocaine and Federal Sentencing Policy 91, 103 (May 2002) (2002 Report); USSC, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007) (2007

Report). The Commission also asked Congress for new legislation embodying a lower crack-to-powder ratio. 1995 Report 198–200; 1997 Report 9–10; 2002 Report 103–107; 2007 Report 6–9. And the Commission recommended that the legislation "include" an "emergency amendment" allowing "the Commission to incorporate the statutory changes" in the Guidelines while "minimiz[ing] the lag between any statutory and guideline modifications for cocaine offenders." *Id.,* at 9.

In 2010, Congress accepted the Commission's recommendations, see 2002 Report 104; 2007 Report 8–9, and n. 26, and enacted the Fair Sentencing Act into law. The Act increased the drug amounts triggering mandatory minimums for crack trafficking offenses from 5 grams to 28 grams in respect to the 5-year minimum and from 50 grams to 280 grams in respect to the 10-year minimum (while leaving powder at 500 grams and 5,000 grams respectively). §2(a), 124 Stat. 2372. The change had the effect of lowering the 100-to-1 crack-to-powder ratio to 18-to-1. (The Act also eliminated the 5-year mandatory minimum for simple possession of crack. §3, 124 Stat. 2372.)

Further, the Fair Sentencing Act instructed the Commission to "make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law." §8(2), *id.,* at 2374. And it directed the Commission to "promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days" after the new Act took effect. §8(1), *ibid.*

The Fair Sentencing Act took effect on August 3, 2010. The Commission promulgated conforming emergency Guidelines amendments that became effective on November 1, 2010. 75 Fed. Reg. 66188 (2010). A permanent version of those Guidelines amendments took effect on

November 1, 2011. See 76 *id.,* at 24960 (2011).

## C

With this background in mind, we turn to the relevant facts of the cases before us. Corey Hill, one of the petitioners, unlawfully sold 53 grams of crack in March 2007, before the Fair Sentencing Act became law. App. in No. 11–5721, pp. 6, 83 (hereinafter Hill App.). Under the 1986 Drug Act, an offender who sold 53 grams of crack was subject to a 10-year mandatory minimum. 21 U. S. C. §841(b)(1)(A)(iii) (2006 ed.). Hill was not sentenced, however, until December 2010, after the Fair Sentencing Act became law and after the new Guidelines amendments had become effective. Hill App. 83–94. Under the Fair Sentencing Act, an offender who sold 53 grams of crack was subject to a 5-year, not a 10-year, minimum. §841(b)(1)(B)(iii) (2006 ed., Supp. IV). The sentencing judge stated that, if he thought that the Fair Sentencing Act applied, he would have sentenced Hill to that Act's 5-year minimum. *Id.,* at 69. But he concluded that the Fair Sentencing Act's lower minimums apply only to those who committed a drug crime after August 3, 2010—the Act's effective date. *Id.,* at 65, 68. That is to say, he concluded that the new Act's more lenient sentences did not apply to those who committed a crime before August 3, even if they were sentenced after that date. Hence, the judge sentenced Hill to 10 years of imprisonment. *Id.,* at 78. The Court of Appeals for the Seventh Circuit affirmed. 417 Fed. Appx. 560 (2011).

The second petitioner, Edward Dorsey (who had previously been convicted of a drug felony), unlawfully sold 5.5 grams of crack in August 2008, before the Fair Sentencing Act took effect. App. in No. 5683, pp. 9, 48–49, 57–58 (hereinafter Dorsey App.). Under the 1986 Drug Act, an offender such as Dorsey with a prior drug felony who sold 5.5 grams of crack was subject to a 10-year minimum.

§841(b)(1)(B)(iii) (2006 ed.). Dorsey was not sentenced, however, until September 2010, after the new Fair Sentencing Act took effect. *Id.,* at 84–95. Under the Fair Sentencing Act, such an offender who sold 5.5 grams of crack was not subject to a mandatory minimum at all, for 5.5 grams is less than the 28 grams that triggers the new Act's mandatory minimum provisions. §841(b)(1)(B)(iii) (2006 ed., Supp. IV). Dorsey asked the judge to apply the Fair Sentencing Act's more lenient statutory penalties. *Id.,* at 54–55.

Moreover, as of Dorsey's sentencing in September 2010, the unrevised Guidelines (reflecting the 1986 Drug Act's old minimums) were still in effect. The Commission had not yet finished revising the Guidelines to reflect the new, lower statutory minimums. And the basic sentencing statute, the Sentencing Reform Act, provides that a judge shall apply the Guidelines that "are in effect on the date the defendant is sentenced." 18 U. S. C. §3553(a)(4)(A)(ii).

The sentencing judge, however, had the legal authority not to apply the Guidelines at all (for they are advisory). But he also knew that he could not ignore a minimum sentence contained in the applicable statute. Dorsey App. 67–68. The judge noted that, even though he was sentencing Dorsey after the effective date of the Fair Sentencing Act, Dorsey had committed the underlying crime prior to that date. *Id.,* at 69–70. And he concluded that the 1986 Drug Act's old minimums, not the new Fair Sentencing Act, applied in those circumstances. *Ibid.* He consequently sentenced Dorsey to the 1986 Drug Act's 10-year mandatory minimum term. *Id.,* at 80. The Court of Appeals for the Seventh Circuit affirmed, *United States* v. *Fisher*, 635 F. 3d 336 (2011), and denied rehearing en banc, 646 F. 3d 429 (2011) *(per curiam)*; see also *United States* v. *Holcomb*, 657 F. 3d 445 (CA7 2011).

The Courts of Appeals have come to different conclusions as to whether the Fair Sentencing Act's more lenient

mandatory minimums apply to offenders whose unlawful conduct took place before, but whose sentencing took place after, the date that Act took effect, namely, August 3, 2010.  Compare *United States* v. *Douglas*, 644 F. 3d 39, 42–44 (CA1 2011) (Act applies), and *United States* v. *Dixon*, 648 F. 3d 195, 203 (CA3 2011) (same), with 635 F. 3d, at 339–340 (Act does not apply), *United States* v. *Sidney*, 648 F. 3d 904, 910 (CA8 2011) (same), and *United States* v. *Tickles*, 661 F. 3d 212, 215 (CA5 2011) *(per curiam)* (same).  In light of that disagreement, we granted Hill's and Dorsey's petitions for certiorari.  Since petitioners and the Government both take the position that the Fair Sentencing Act's new minimums do apply in these circumstances, we appointed as *amicus curiae* Miguel Estrada to argue the contrary position.  He has ably discharged his responsibilities.

## II

### A

The timing issue before us is difficult in part because relevant language in different statutes argues in opposite directions.  See Appendix A, *infra.*  On the one hand, a federal saving statute, Act of Feb. 25, 1871 (1871 Act), §4, 16 Stat. 432, phrased in general terms, provides that a new criminal statute that "repeal[s]" an older criminal statute shall not change the penalties "incurred" under that older statute "unless the repealing Act shall so expressly provide."  1 U. S. C. §109.  Case law makes clear that the word "repeal" applies when a new statute simply diminishes the penalties that the older statute set forth.  See *Warden* v. *Marrero*, 417 U. S. 653, 659–664 (1974); see also *United States* v. *Tynen*, 11 Wall. 88, 92 (1871).  Case law also makes clear that penalties are "incurred" under the older statute when an offender becomes subject to them, *i.e.,* commits the underlying conduct that makes the offender liable.  See *United States* v. *Reisinger*, 128 U. S.

398, 401 (1888); *Great Northern R. Co.* v. *United States*, 208 U. S. 452, 464–470 (1908).

On the other hand, the Sentencing Reform Act says that, regardless of when the offender's conduct occurs, the applicable Guidelines are the ones "in effect on the date the defendant is sentenced." 18 U. S. C. §3553(a)(4)(A)(ii). And the Fair Sentencing Act requires the Commission to change the Guidelines in the wake of the Act's new minimums, making them consistent with "other guideline provisions and applicable law." §8(2), 124 Stat. 2374.

Courts that have held that they must apply the old, higher 1986 Drug Act minimums to all pre-Act offenders, including those sentenced after the Fair Sentencing Act took effect, have emphasized that the 1871 Act requires that result unless the Fair Sentencing Act either expressly says or at least by fair implication implies the contrary. See 635 F. 3d, at 339–340; *Sidney, supra*, at 906–908; *Tickles, supra*, at 214–215; see also *Holcomb, supra,* at 446–448 (opinion of Easterbrook, J.). Courts that have concluded that the Fair Sentencing Act's more lenient penalties apply have found in that Act, together with the Sentencing Reform Act and other related circumstances, indicia of a clear congressional intent to apply the new Act's minimums. See *Douglas, supra*, at 42–44; *Dixon, supra*, at 199–203; see also *Holcomb,* 657 F. 3d, at 454–457 (Williams, J., dissenting from denial of rehearing en banc); *id.,* at 461–463 (Posner, J., dissenting from denial of rehearing en banc). We too take the latter view. Six considerations, taken together, convince us that Congress intended the Fair Sentencing Act's more lenient penalties to apply to those offenders whose crimes preceded August 3, 2010, but who are sentenced after that date.

First, *the 1871 saving statute permits Congress to apply a new Act's more lenient penalties to pre-Act offenders without expressly saying so in the new Act*. It is true that the 1871 Act uses the words "expressly provide." 1

U. S. C. §109.  But the Court has long recognized that this saving statute creates what is in effect a less demanding interpretive requirement.  That is because statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified.  See, *e.g., Fletcher* v. *Peck*, 6 Cranch 87, 135 (1810); *Reichelderfer* v. *Quinn*, 287 U. S. 315, 318 (1932).  And Congress remains free to express any such intention either expressly or by implication as it chooses.

Thus, the Court has said that the 1871 Act "cannot justify a disregard of the will of Congress as manifested either expressly or by *necessary implication* in a subsequent enactment."  *Great Northern R. Co., supra*, at 465 (emphasis added).  And in a comparable context the Court has emphasized that the Administrative Procedure Act's use of the word "expressly" does not require Congress to use any "magical passwords" to exempt a later statute from the provision.  *Marcello* v. *Bonds*, 349 U. S. 302, 310 (1955).  Without requiring an "express" statement, the Court has described the necessary indicia of congressional intent by the terms "necessary implication," "clear implication," and "fair implication," phrases it has used interchangeably.  *Great Northern R. Co.*, *supra*, at 465, 466; *Hertz* v. *Woodman*, 218 U. S. 205, 218 (1910); *Marrero, supra*, at 660, n. 10.  One Member of the Court has said we should determine whether "the plain import of a later statute directly conflicts with an earlier statute," and, if so, "the later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'"  *Lockhart* v. *United States*, 546 U. S. 142, 149 (2005) (SCALIA, J., concurring).

Hence, the Court has treated the 1871 Act as setting forth an important background principle of interpretation.  The Court has also assumed Congress is well aware of the

background principle when it enacts new criminal statutes. *E.g., Great Northern R. Co., supra*, at 465; *Hertz, supra*, at 217; cf. *Marcello, supra*, at 310. And the principle requires courts, before interpreting a new criminal statute to apply its new penalties to a set of pre-Act offenders, to assure themselves that ordinary interpretive considerations point clearly in that direction. Words such as "plain import," "fair implication," or the like reflect the need for that assurance. And it is that assurance, which we shall assume is conveyed by the phrases "plain import" or "fair implication," that we must look for here.

Second, *the Sentencing Reform Act sets forth a special and different background principle.* That statute says that when "determining the particular sentence to be imposed" in an initial sentencing, the sentencing court "shall consider," among other things, the "sentencing range" established by the Guidelines that are "*in effect on the date the defendant is sentenced.*" 18 U. S. C. §3553(a)(4)(A)(ii) (emphasis added). Although the Constitution's *Ex Post Facto* Clause, Art. I, §9, cl. 3, prohibits applying a new Act's higher penalties to pre-Act conduct, it does not prohibit applying lower penalties. See *Calder* v. *Bull*, 3 Dall. 386, 390–391 (1798); *Collins* v. *Youngblood*, 497 U. S. 37, 41–44 (1990). The Sentencing Commission has consequently instructed sentencing judges to "use the Guidelines Manual in effect on the date that the defendant is sentenced," regardless of when the defendant committed the offense, unless doing so "would violate the *ex post facto* clause." USSG §1B1.11. And therefore when the Commission adopts new, lower Guidelines amendments, those amendments become effective to offenders who committed an offense prior to the adoption of the new amendments but are sentenced thereafter. Just as we assume Congress was aware of the 1871 Act's background norm, so we assume that Congress was aware of this different background sentencing principle.

Third, *language in the Fair Sentencing Act implies that Congress intended to follow the Sentencing Reform Act background principle here.* A section of the Fair Sentencing Act entitled "Emergency Authority for United States Sentencing Commission" requires the Commission to promulgate "as soon as practicable" (and not later than 90 days after August 3, 2010) "conforming amendments" to the Guidelines that "achieve consistency with other guideline provisions and applicable law." §8, 124 Stat. 2374. Read most naturally, "applicable law" refers to the law as changed by the Fair Sentencing Act, including the provision reducing the crack mandatory minimums. §2(a), *id.,* at 2372. As the Commission understood this provision, achieving consistency with "other guideline provisions" means reducing the base offense levels for all crack amounts proportionally (using the new 18-to-1 ratio), including the offense levels governing small amounts of crack that did not fall within the scope of the mandatory minimum provisions. 75 Fed. Reg. 66191. And consistency with "other guideline provisions" and with prior Commission practice would require application of the new Guidelines amendments to offenders who committed their offense prior to the new amendments' effective date but were sentenced thereafter. See USSG §1B1.11(a); *e.g.,* USSG App. C, amdts. 706, 711 (Supp. Nov. 2004–Nov. 2007); see also Memorandum from G. Schmitt, L. Reed, & K. Cohen, USSC, to Chair Hinojosa et al., Subject: Analysis of the Impact of the Crack Cocaine Amendment if Made Retroactive 23 (Oct. 3, 2007). Cf. USSG App. C, amdt. 571 (amendment *increasing* restitution, which may present *ex post facto* and one-book-rule concerns, would apply only to defendants sentenced for post-amendment offenses), discussed *post,* at 5 (SCALIA, J., dissenting).

Fourth, *applying the 1986 Drug Act's old mandatory minimums to the post-August 3 sentencing of pre-August 3 offenders would create disparities of a kind that Congress*

*enacted the Sentencing Reform Act and the Fair Sentencing Act to prevent.* Two individuals with the same number of prior offenses who each engaged in the same criminal conduct involving the same amount of crack and were sentenced at the same time would receive radically different sentences. For example, a first-time post-Act offender with five grams of crack, subject to a Guidelines range of 21 to 27 months, could receive two years of imprisonment, while an otherwise identical pre-Act offender would have to receive the 5-year mandatory minimum. Compare USSG §2D1.1(c) (Nov. 2011) with 21 U. S. C. §841(b)(1)(B) (2006 ed.). A first-time post-Act 50-gram offender would be subject to a Guidelines range of less than six years of imprisonment, while his otherwise identical pre-Act counterpart would have to receive the 10-year mandatory minimum. Compare USSG §2D1.1(c) (Nov. 2011) with 21 U. S. C. §841(b)(1)(A) (2006 ed.).

Moreover, unlike many prechange/postchange discrepancies, the imposition of these disparate sentences involves roughly contemporaneous sentencing, *i.e.,* the same time, the same place, and even the same judge, thereby highlighting a kind of unfairness that modern sentencing statutes typically seek to combat. See, *e.g.,* 28 U. S. C. §991(b)(1)(B) (purposes of Guidelines-based sentencing include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); S. Rep. No. 98–223, p. 74 (1983) (explaining rationale for using same, current Guidelines for all roughly contemporaneous sentencings). Further, it would involve imposing upon the pre-Act offender a pre-Act sentence at a time after Congress had specifically found in the Fair Sentencing Act that such a sentence was unfairly long.

Finally, one cannot treat such problems as if they were minor ones. Given the 5-year statute of limitations for federal drug offenses, the 11-month median time between

indictment and sentencing for those offenses, and the approximately 5,000 federal crack offenders convicted each year, many pre-Act offenders were not (and will not be) sentenced until after August 3, 2010, when the new, more lenient mandatory minimums took effect. See 18 U. S. C. §3282(a); Administrative Office of United States Courts, Judicial Business of the United States Courts, p. 272 (2010) (Table D–10); 2011 Report 191.

Fifth, *not to apply the Fair Sentencing Act would do more than preserve a disproportionate status quo; it would make matters worse.* It would create new anomalies—new sets of disproportionate sentences—not previously present. That is because sentencing courts must apply new Guidelines (consistent with the Fair Sentencing Act's new minimums) to pre-Act offenders, see *supra,* at 13–14, and the 1986 Drug Act's old minimums would trump those new Guidelines for some pre-Act offenders but not for all of them—say, pre-Act offenders who possessed crack in small amounts not directly the subject of mandatory minimums.

Consider, for example, a first-time offender convicted of possessing with intent to distribute four grams of crack. No mandatory sentence, under the 1986 Drug Act or the Fair Sentencing Act, applies to an offender possessing so small an amount. Yet under the old law, the Commission, charged with creating proportionate sentences, had created a Guidelines range of 41 to 51 months for such an offender, a sentence proportional to the 60 months that the 1986 Drug Act required for one who trafficked five grams of crack. See *supra,* at 5–6; USSG §2D1.1(c) (Nov. 2009).

The Fair Sentencing Act, however, requires the Commission to write new Guidelines consistent with the new law. The Commission therefore wrote new Guidelines that provide a sentencing range of 21 to 27 months—about two years—for the first-time, 4-gram offender. See USSG §2D1.1(c) (Nov. 2011). And the Sentencing Reform Act

requires application of those new Guidelines to all offenders (including pre-Act offenders) who are sentenced once those new Guidelines take effect. See 18 U. S. C. §3553(a)(4)(A)(ii). Those new Guidelines must take effect and apply to a pre-Act 4-gram offender, for such an offender was never subject to a trumping statutory 1986 Drug Act mandatory minimum. However, unless the Fair Sentencing Act's new, more lenient mandatory minimums apply to pre-Act offenders, an otherwise identical offender who possessed five grams would have to receive a 5-year sentence. See 21 U. S. C. §841(b)(1)(B) (2006 ed., Supp. IV).

For example, imagine that on July 1, 2010, both Smith and Jones commit a crack crime identical but for the fact that Smith possesses with intent to distribute four grams of crack and Jones five grams. Both are sentenced on December 1, 2010, after the Fair Sentencing Act and the new Guidelines take effect. Smith's Guidelines sentence would be two years, but unless the Fair Sentencing Act applies, Jones's sentence would have to be five years. The difference of one gram would make a difference, not of only one year as it did before enactment of the Fair Sentencing Act, but instead of three years. Passage of the new Act, designed to have brought about fairer sentences, would here have created a new disparate sentencing "cliff."

Nor can one say that the new Act would produce disproportionalities like this in only a few cases. In fiscal year 2010, 17.8 percent of all crack offenders were convicted of offenses not subject to the 1986 Drug Act's minimums. 2011 Report 191. And since those minimums apply only to some drug offenders and they apply in different ways, one can find many similar examples of disproportionalities. See Appendix B, *infra*. Thus, application of the 1986 Drug Act minimums to pre-Act offenders sentenced after the new Guidelines take effect would produce a crazy quilt of sentences, at odds with Congress' basic efforts to achieve

more uniform, more proportionate sentences. Congress, when enacting the Fair Sentencing Act, could not have intended any such result.

Sixth, *we have found no strong countervailing considera-tion. Amicus* and the dissent argue that one might read much of the statutory language we have discussed as embodying exceptions, permitting the old 1986 Drug Act minimums to apply to pre-Act offenders sentenced after August 3, 2010, when the Fair Sentencing Act took effect. The words "applicable law" in the new Act, for example, could, linguistically speaking, encompass the 1986 Drug Act minimums applied to those sentenced after August 3. *Post,* at 4–6 (SCALIA, J., dissenting). Moreover, Congress could have insisted that the Commission write new Guide-lines with special speed to assure itself that new, post-August 3 offenders—but not old, pre-August 3 offenders—would receive the benefit of the new Act. *Post,* at 6–8. Further, *amicus* and the dissent note that to apply the new Act's minimums to the old, pre-August 3 offenders will create a new disparity—one between pre-Act offenders sentenced before August 3 and those sentenced after that date. *Post,* at 9.

We do not believe that these arguments make a critical difference. Even if the relevant statutory language can be read as amicus and the dissent suggest and even if Congress *might* have wanted Guidelines written speedily simply in order to apply them quickly to new offenders, there is scant indication that this is what Congress *did* mean by the language in question nor that such was in fact Congress' motivation. The considerations we have set forth, *supra,* at 13–17 and this page, strongly suggest the contrary.

We also recognize that application of the new minimums to pre-Act offenders sentenced after August 3 will create a new set of disparities. But those disparities, reflecting a line-drawing effort, will exist whenever Congress enacts a

new law changing sentences (unless Congress intends re-opening sentencing proceedings concluded prior to a new law's effective date). We have explained how in federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced. *Supra,* at 13; compare 18 U. S. C. §3553(a)(4)(A)(ii) with §3582(c). And we have explained how, here, continued application of the old 1986 Drug Act minimums to those pre-Act offenders sentenced after August 3 would make matters worse. *Supra,* at 16–18. We consequently conclude that this particular new disparity (between those pre-Act offenders already sentenced and those not yet sentenced as of August 3) cannot make a critical difference.

For these reasons considered as a whole, we conclude that Congress intended the Fair Sentencing Act's new, lower mandatory minimums to apply to the post-Act sentencing of pre-Act offenders. That is the Act's "plain import" or "fair implication."

## B

We add one final point. Several arguments we have discussed involve the language of statutes that determine how new *Guidelines* take effect. *Supra,* at 13–14. What about those who committed an offense prior to August 3 and were sentenced after August 3 but before November 1, 2010—a period *after* the new Act's effective date but *before* the new Guidelines first took effect? Do the Fair Sentencing Act's new mandatory minimums apply to them?

In our view, the new Act's lower minimums apply to them as well. Our reason is that the statute simply instructs the Commission to promulgate new Guidelines "as soon as practicable" (but no later than 90 days after the Act took effect). §8(1), 124 Stat. 2374. As far as Congress was concerned, the Commission might have (having prepared new Guidelines in advance) promulgated those

Guidelines within a few days—perhaps on August 3 itself. At the same time, the Commission possesses ample authority to permit appropriate adjustments to be made in the Guidelines sentences of those sentenced after August 3 but prior to the new Guidelines promulgation. See 28 U. S. C. §994(u) (power to make Guidelines reductions retroactive); 76 Fed. Reg. 41333–41334 (2011) (amended 18-to-1 Guidelines made retroactive). In any event, courts, treating the Guidelines as advisory, possess authority to sentence in accordance with the new minimums.

For these reasons, if the Fair Sentencing Act's new minimums apply to all of those sentenced after August 3, 2010 (even if the new Guidelines were not yet ready), it is possible to foresee a reasonably smooth transition. On the other hand, it is difficult to foresee such a transition if the new Act's application is keyed to a later date, thereby leaving the courts unable to take the new Act fully into account, particularly when that circumstance might create additional disparities and uncertainties that courts and the Commission may be helpless to correct. We have no reason to believe Congress would have wanted to impose an unforeseeable, potentially complex application date.

*     *     *

We vacate the Court of Appeals' judgments and remand these cases for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIXES

A

Act of Feb. 25, 1871, §4, 16 Stat. 432, 1 U. S. C. §109

**Repeal of statutes as affecting existing liabilities**

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

Sentencing Reform Act of 1984, 18 U. S. C. §3553(a)(4)(A)(ii)

**Imposition of a sentence**

"FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE. . . . The court, in determining the particular sentence to be imposed, shall consider . . . the kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . that . . . are in effect on the date the defendant is sentenced . . . ."

Fair Sentencing Act of 2010, §8, 124 Stat. 2374

**Emergency Authority for United States Sentencing Commission**

"The United States Sentencing Commission shall—

"(1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sen-

tencing Act of 1987 (28 U. S. C. [§]994 note), as though the authority under that Act had not expired; and

   "(2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law."

### B

The following chart shows the sentencing scheme that would result for first-time pre-Act crack offenders if the 1986 Drug Act's old 100-to-1 mandatory minimums remain in effect after the Fair Sentencing Act's new 18-to-1 Guidelines became effective. 21 U. S. C. §§841(b)(1)(A)–(C) (2006 ed.); USSG §§2D1.1(c), 5G1.1(b) (Nov. 2011).

*1986 Drug Act Minimums and Fair Sentencing Act Guidelines for Category I Offenders with No Prior Drug Felonies*

| Drug Quantity | Mandatory Minimum | Guidelines Range | Sentence |
|---|---|---|---|
| 1 g | 0 months | 10–16 | 10–16 |
| 2 g | 0 | 15–21 | 15–21 |
| 3 g | 0 | 21–27 | 21–27 |
| 4 g | 0 | 21–27 | 21–27 |
| 5 g | 60 | 21–27 | 60 |
| 10 g | 60 | 27–33 | 60 |
| 15 g | 60 | 33–41 | 60 |
| 20 g | 60 | 41–51 | 60 |
| 25 g | 60 | 51–63 | 60–63 |
| 35 g | 60 | 63–78 | 63–78 |
| 50 g | 120 | 63–78 | 120 |
| 100 g | 120 | 63–78 | 120 |
| 150 g | 120 | 78–97 | 120 |
| 200 g | 120 | 97–121 | 120–121 |
| 500 g | 120 | 121–151 | 121–151 |
| 1,500 g | 120 | 151–188 | 151–188 |

The chart illustrates the disproportionate sentences that such a scheme would create. See *supra,* at 16–18. For one thing, it would create sentencing "cliffs" at the 1986 Act's old triggering amounts of 5 grams and 50 grams (where the old minimums would entirely trump the new Guidelines), resulting in radically different Guidelines sentences

for small differences in quantity. For another, because of those "cliffs," the scheme would create similar Guidelines sentences for offenders who dealt in radically different amounts of crack, *e.g.,* 50 grams versus 500 grams.

To be sure, as *amicus* points out, Congress has provided two mechanisms through which an offender may escape an otherwise applicable mandatory minimum, diminishing this problem for some offenders. First, an offender may escape a minimum by providing substantial assistance in the investigation or prosecution of another person. 18 U. S. C. §3553(e); Fed. Rule Crim. Proc. 35(b); see also 28 U. S. C. §994(n); USSG §5K1.1. Second, under 18 U. S. C. §3553(f), drug offenders who have little or no criminal history and who satisfy other requirements in the provision may obtain "safety valve" relief. See also USSG §5C1.2. And because of these mechanisms a substantial portion of first-time offenders are relieved of application of a mandatory minimum. However, offenders with a criminal history category of II or higher are ineligible for "safety valve" relief; they escape application of a minimum at a much lower percentage. See 2011 Report 193 (Table 8–8).

*Crack Offender Categories by Application of 1986 Drug Act Mandatory Min. (FY 2010)*

| *Offender Category* | *Total Offenders* | *Total with Quantity Carrying Mandatory Min.* | *Percent with Quantity Carrying Mandatory Min.* | *Total Relieved of Mandatory Min. Appl.* | *Percent Relieved of Mandatory Min. Appl.* |
|---|---|---|---|---|---|
| I | 1,055 | 890 | 84.4% | 525 | 59.0% |
| II | 556 | 445 | 80.0% | 129 | 29.0% |
| III | 865 | 703 | 81.3% | 208 | 29.6% |
| IV | 556 | 469 | 84.4% | 124 | 26.4% |
| V | 380 | 308 | 81.1% | 89 | 28.9% |
| VI | 1,345 | 1,086 | 80.7% | 332 | 30.6% |
| All | 4,751 | 3,905 | 82.2% | 1,407 | 36.0% |

Yet similar sentencing anomalies would result for re-peat offenders if the 1986 Drug Act's minimums remain in effect after the Fair Sentencing Act's Guidelines became effective.  Take, for example, Category II offenders.

*1986 Drug Act Minimums and Fair Sentencing Act Guidelines for Category II Offenders with No Prior Drug Felonies*

| *Drug Quantity* | *Mandatory Minimum* | *Guidelines Range* | *Sentence* |
|---|---|---|---|
| 1 g | 0 months | 12–18 | 12–18 |
| 2 g | 0 | 18–24 | 18–24 |
| 3 g | 0 | 24–30 | 24–30 |
| 4 g | 0 | 24–30 | 24–30 |
| 5 g | 60 | 24–30 | 60 |
| 10 g | 60 | 30–37 | 60 |
| 15 g | 60 | 37–46 | 60 |
| 20 g | 60 | 46–57 | 60 |
| 25 g | 60 | 57–71 | 60–71 |
| 35 g | 60 | 70–87 | 70–87 |
| 50 g | 120 | 70–87 | 120 |
| 100 g | 120 | 70–87 | 120 |
| 150 g | 120 | 87–108 | 120 |
| 200 g | 120 | 108–135 | 120–135 |
| 500 g | 120 | 135–168 | 135–168 |
| 1,500 g | 120 | 168–210 | 168–210 |

As the chart illustrates, for Category II offenders account-able for 5 to 22 grams of crack or for 50 to 195 grams, the 100-to-1 minimums would entirely trump the 18-to-1 Guidelines, producing the same anomalies—dissimilar sen-tences for similar quantities and similar sentences for dis-similar quantities—described above.

In contrast, a scheme with the Fair Sentencing Act's 18-to-1 minimums and new Guidelines produces the propor-tionality in sentencing that Congress intended in enacting

the Sentencing Reform Act and the Fair Sentencing Act.

*Fair Sentencing Act Minimums and Guidelines for Category II Offenders with No Prior Drug Felonies*

| *Drug Quantity* | *Mandatory Minimum* | *Guidelines Range* | *Sentence* |
|---|---|---|---|
| 1 g | 0 months | 12–18 | 12–18 |
| 2 g | 0 | 18–24 | 18–24 |
| 3 g | 0 | 24–30 | 24–30 |
| 4 g | 0 | 24–30 | 24–30 |
| 5 g | 0 | 24–30 | 24–30 |
| 10 g | 0 | 30–37 | 30–37 |
| 15 g | 0 | 37–46 | 37–46 |
| 20 g | 0 | 46–57 | 46–57 |
| 25 g | 0 | 57–71 | 57–71 |
| 35 g | 60 | 70–87 | 70–87 |
| 50 g | 60 | 70–87 | 70–87 |
| 100 g | 60 | 70–87 | 70–87 |
| 150 g | 60 | 87–108 | 87–108 |
| 200 g | 60 | 108–135 | 108–135 |
| 500 g | 120 | 135–168 | 135–168 |
| 1,500 g | 120 | 168–210 | 168–210 |

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 11–5683 and 11–5721

_____

EDWARD DORSEY, SR., PETITIONER
11–5683          *v.*
UNITED STATES


COREY A. HILL, PETITIONER
11–5721          *v.*
UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 21, 2012]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

In the Fair Sentencing Act of 2010, 124 Stat. 2372, Congress increased the threshold quantities of crack cocaine required to trigger the 5- and 10-year mandatory minimum penalties associated with offenses involving the manufacture, distribution, or dispensation of the drug, and eliminated the 5-year mandatory minimum previously associated with simple possession of it. The Act is silent as to whether these changes apply to defendants who committed their offenses before, but whose sentencing proceedings occurred after, its August 3, 2010, effective date. In my view, the general saving statute, 1 U. S. C. §109, dictates that the new, more lenient mandatory minimum provisions do not apply to such pre-enactment offenders.

I

The Court starts off on the right foot by acknowledging, *ante,* at 10–11, that the ameliorative amendments at issue

here trigger application of the general saving statute.
Enacted in 1871 to reverse the common-law rule that the
repeal or amendment of a criminal statute would abate all
nonfinal convictions under the repealed or amended stat-
ute, see *Warden* v. *Marrero*, 417 U. S. 653, 660 (1974), the
saving statute provides in relevant part:

> "The repeal of any statute shall not have the effect
> to release or extinguish any penalty, forfeiture, or lia-
> bility incurred under such statute, unless the repeal-
> ing Act shall so expressly provide, and such statute
> shall be treated as still remaining in force for the pur-
> pose of sustaining any proper action or prosecution for
> the enforcement of such penalty, forfeiture, or liabil-
> ity."  1 U. S. C. §109.

By reducing the statutory penalties for crack cocaine
offenses, the Fair Sentencing Act "repeal[ed]" the former
penalties; for defendants who committed their offenses
(and hence "incurred" the penalties) while the prior law
was in force, §109 directs that the prior law "shall be
treated as still remaining in force."

Although §109 purports to require that subsequent
legislation opting out of its default rule must do so "ex-
pressly," the Court correctly observes, *ante,* at 12, that
express-statement requirements of this sort are ineffec-
tive.  See *Lockhart* v. *United States*, 546 U. S. 142, 147–
150 (2005) (SCALIA, J., concurring).  Because "one legis-
lature cannot abridge the powers of a succeeding legisla-
ture," *Fletcher* v. *Peck*, 6 Cranch 87, 135 (1810), a statute
is "alterable when the legislature shall please to alter it,"
*Marbury* v. *Madison*, 1 Cranch 137, 177 (1803).  Conse-
quently, the express-statement requirement of §109 is
itself subject to repeal on the same terms as any other
statute, which is to say that a repeal may be accomplished
by implication.  See, *e.g., Marrero, supra,* at 659–660,
n. 10; *Great Northern R. Co.* v. *United States*, 208 U. S.

452, 465 (1908).

Understanding the interpretive problem posed by these cases as one of implied repeal helps to explain the Court's observation, *ante,* at 13, that what is required to override §109's default rule is a clear demonstration of congressional intent to do so. Admittedly, our cases have not spoken with the utmost clarity on this point. In *Marrero*, for example, we suggested that a "fair implication" from a subsequently enacted statute would suffice, 417 U. S., at 660, n. 10, while in *Hertz* v. *Woodman*, 218 U. S. 205 (1910), we used the phrase "*clear* implication," *id.,* at 218 (emphasis added); see also *ibid.* ("plain implication"). In *Great Northern R. Co.*, we split the difference, stating at one point that §109 controls unless Congress expresses a contrary intention "either expressly or by *necessary* implication in a subsequent enactment," 208 U. S., at 465 (emphasis added), but suggesting at another point that a "fair implication," *id.,* at 466, would do. In my view, the "fair implication" formulation understates the burden properly imposed on a defendant who would claim an implicit exception from §109's terms. Because the effect of such an exception is to work a *pro tanto* repeal of §109's application to the defendant's case, the implication from the subsequently enacted statute must be clear enough to overcome our strong presumption against implied repeals. See, *e.g., Matsushita Elec. Industrial Co.* v. *Epstein*, 516 U. S. 367, 381 (1996); *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). Thus, we should conclude that Congress has deviated from §109 (or any similar statute establishing a background interpretive principle) only when the "*plain* import of a later statute directly conflicts" with it. *Lockhart*, *supra*, at 149 (SCALIA, J., concurring) (emphasis added).

## II

## A

The considerations relied upon by the Court do not come close to satisfying the demanding standard for repeal by implication. As an initial matter, there is no persuasive force whatever to the Court's observation that continuing to apply the prior mandatory minimums to pre-enactment offenders would "involve imposing upon the pre-Act offender a pre-Act sentence at a time after Congress had specifically found in the Fair Sentencing Act that such a sentence was unfairly long." *Ante,* at 15. That is true *whenever* Congress reduces a criminal penalty, and so is a consequence that Congress affirmatively *embraced* when it said in §109 that ameliorative amendments to criminal statutes do not apply to pre-enactment conduct. Nor does it matter that Congress has instructed district courts, when applying the Federal Sentencing Guidelines, to apply the version in force on the date of sentencing, with the object of reducing disparities in sentences between similar defendants who are sentenced for the same conduct at the same time. See 18 U. S. C. §3553(a)(4)(A)(ii). The presumption against implied repeals requires us to give effect, if possible, to both §3553(a)(4)(A)(ii) and §109. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974). We may readily do so here by holding that §3553(a)(4)(A)(ii) applies to Guidelines amendments, and §109 to statutory ones.

The Court also stresses that the Fair Sentencing Act instructs the Sentencing Commission to promulgate "as soon as practicable" (and not later than 90 days after August 3, 2010) "such conforming amendments" to the Sentencing Guidelines "as the Commission determines

necessary to achieve consistency with other guideline provisions and applicable law." §8, 124 Stat. 2374. The argument goes that, because the Commission implemented this directive by reducing the Guidelines ranges for crack cocaine offenses to track the 18-to-1 crack-to-powder ratio reflected in the new mandatory minimums, see 75 Fed. Reg. 66191 (2010), and because the general rule is that a sentencing court should apply the version of the Guidelines in effect at the time of sentencing, see 18 U. S. C. §3553(a)(4)(A)(ii), Congress must have understood that the new mandatory minimums would apply immediately, since otherwise there would be a mismatch between the statutory penalties and Guidelines ranges.

That conclusion simply does not follow. For one thing, the argument begs the very question presented here: What is the "applicable law" relevant to pre-enactment offenders who are sentenced after enactment? The Commission could well have answered this question by concluding that, in light of §109, the law applicable to such offenders is the pre-Act mandatory minimums. It might therefore have retained, as to those offenders, the existing Guidelines ranges reflecting a higher crack-to-powder ratio. Although rare, it is not unheard of for the Commission to establish Guidelines whose application turns on the date of commission of the defendant's offense. See United States Sentencing Commission, Guidelines Manual §5E1.1(g)(1) (Nov. 2011) (governing restitution for offenses committed on or after November 1, 1997, and providing that the prior version of the Guideline shall govern all other cases); *id.*, §8B1.1(f)(1) (same for restitution obligations of organizational defendants). Of course, the Commission did not interpret the Fair Sentencing Act's directive in this manner. But the possibility that it *could* (not to mention the probability that it *should*) have done so illustrates the folly of basing inferences about what Congress intended when it passed the Fair Sentencing Act on decisions the

Commission would not make until several months later.[1]

Moreover, even if one takes it as given that the Commission's new crack cocaine Guidelines would apply the lower 18-to-1 ratio to all defendants sentenced after the new Guidelines were put in place, it would not follow that Congress *necessarily* expected the new mandatory minimums to apply to pre-enactment offenders. The directive to update the Guidelines on an emergency basis is equally consistent with Congress's seeking to avoid a mismatch between the Guidelines and the statutory penalties for *post-enactment* offenders sentenced shortly after the Act's effective date.

Petitioners and the Government discount this explanation, noting that because of the lags associated with investigating and prosecuting drug offenses, most of the defendants sentenced on the 91st day after the Fair Sentencing Act's enactment were sure to be pre-Act offenders. If Congress did not expect the new mandatory minimums to apply to such offenders, they say, there would have been no need to ensure that revised Guidelines were in place so quickly. But *most* is not *all*, and it would have been entirely sensible for Congress to worry that *some* post-Act offenders—offenders clearly subject to the new mandatory minimums—would nonetheless be sentenced under outdated Guidelines if the Guidelines were not revised in short order.

The 11-month median time between indictment and

_____

[1] Congressional reliance on future Commission action might be plausible if the Commission had a settled practice of tying reductions in statutory mandatory minimums to immediately applicable reductions in Guidelines ranges, without any distinction based on the timing of the defendant's offense. But the Court does not cite any such settled practice, and I am not aware of any. Presumably there has been no occasion for a practice to develop either way, since congressional legislation reducing criminal penalties is, in this day and age, very rare.

sentencing for non-marijuana federal drug offenses, see Administrative Office of United States Courts, Judicial Business of the United States Courts, p. 272 (2010) (Table D–10), does not establish that prompt issuance of new Guidelines for post-Act offenders could not have been a pressing concern. Because that is a *median* figure, it shows that half of all drug defendants are sentenced sooner than 11 months after being indicted. And it is only an *aggregate* figure. For drug possession offenses—relevant here because the Fair Sentencing Act eliminated the mandatory minimum sentence previously applicable to simple possession of crack cocaine, see §3, 124 Stat. 2372—the equivalent figure was just 5.4 months from indictment to sentencing. The pace of criminal cases also varies considerably from district to district. In the Eastern District of Virginia, for instance, the median time from indictment to sentencing for all criminal cases was just 3.6 months. See Judicial Business, *supra,* at 252 (Table D–6). What is more, without the Fair Sentencing Act's emergency directive, amendments to the Guidelines to implement the Act likely would not have been put in place until more than a year after its passage.[2] In the interim, a great

———————

[2] In the ordinary course, the Commission may submit proposed Guidelines amendments to Congress "at or after the beginning of a regular session of Congress, but not later than the first day of May." 28 U. S. C. §994(p). Unless disapproved by Congress, the proposed amendments "take effect on a date specified by the Commission, which shall be no earlier than 180 days after being so submitted and no later than the first day of November of the calendar year in which the amendment . . . is submitted." *Ibid.* As a matter of practice, the Commission has adopted November 1 as the default effective date for its proposed amendments. See United States Sentencing Commission, Rules of Practice and Procedure, Rule 4.1 (amended Aug. 2007). Because the Fair Sentencing Act was enacted on August 3, 2010—after May 1—there would have been no opportunity for the Commission to submit proposed amendments to Congress until January 2011. Given the 180-day waiting period, the amendments could not have gone into force until the very end of June 2011 at the earliest. And in all likeli-

many post-Act offenders might have been sentenced under the outdated Guidelines, even though they were clearly entitled to take advantage of the statutory amendments. Because the emergency authority conferred on the Commission can reasonably be understood as directed at *this* mismatch problem, it creates no clear implication that Congress expected the new statutory penalties to apply to pre-enactment offenders.

The Court's last argument is that continuing to apply the prior mandatory minimums to pre-enactment offenders would lead to anomalous, disproportionate sentencing results. It is true enough, as the Court notes, *ante*, at 16–18, that applying the prior mandatory minimums in tandem with the new Guidelines provisions—which track the new, more lenient mandatory minimums—leads to a series of "cliffs" at the mandatory minimum thresholds. But this does not establish that Congress clearly meant the new mandatory minimums to apply to pre-enactment offenders. As noted above, *supra,* at 5–6, there is no reason to take the Guidelines amendments ultimately promulgated by the Commission as a given when evaluating what Congress would have understood when the Fair Sentencing Act was enacted. The Commission could have promulgated amendments that ameliorated this problem by retaining the old Guidelines ranges for pre-enactment offenders.

Moreover, although the cliffs produced by the mismatch between Guidelines and statutory penalties are admittedly inconsistent with the premise of the Guidelines system that sentences should vary in proportion to the gravity of the offense and the culpability of the offender, see 18 U. S. C. §3553(a)(1), (a)(2)(A), the same objection can be lodged against *any* mandatory minimum that trumps an otherwise applicable Guidelines range. And it is not as

---

hood, they would not have been effective until November 1, 2011.

though the results of continuing to apply the pre-Act statutory penalties are so senseless as to establish that Congress must not have intended them. Retaining the old mandatory minimums ensures at least rough equivalence in sentences for defendants who committed their crimes at the same time, but were sentenced at different times— even as it leads to disparities for defendants who are sentenced at the same time, but committed their offenses at different times. In light of this plausible basis for continuing to apply the prior law to pre-enactment offenders, there is no reason to conclude that Congress *necessarily* expected the new statutory penalties to apply.

### B

Petitioners and the Government press a handful of additional arguments which require only brief discussion. They first contend that an intention to apply the new mandatory minimums to pre-enactment offenders can be inferred from §10 of the Fair Sentencing Act, 124 Stat. 2375, which instructs the Commission to study the effects of the new law and make a report to Congress within five years. The suggestion is that, if the statutory penalties do not apply to pre-enactment offenders, then the Act would have no effect on many defendants sentenced during the study period, which would in turn undermine Congress's goal of compiling useful data. This is makeweight. Whether or not the new mandatory minimums are held applicable to pre-enactment offenders, they will be applied to many post-enactment offenders during the study period, and the Commission will have the opportunity to collect useful data. The study provision simply has nothing to say about the question at issue here.

The Government also notes that the Senate bill that ultimately became the Fair Sentencing Act was based on an earlier bill which contained a provision that would have delayed the Act's effective date until 180 days after

passage, and specifically provided that "[t]here shall be no retroactive application of any portion of this Act."  H. R. 265, 111th Cong., 1st Sess., §11 (2009).  Even if one is inclined to base inferences about statutory meaning on unenacted versions of the relevant bill, but see *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 668 (2006) (SCALIA, J., dissenting), this argument from drafting history is unpersuasive. That Congress considered and rejected a proposal that would have delayed application of the Act until 180 days after passage says nothing about whether the version finally enacted applies to defendants whose criminal conduct pre-dated the Act.  Moreover, the same bill would have provided permissive authority for the Commission to promulgate amended Guidelines on an emergency basis, see §8(a), notwithstanding its delayed effective date provision.  This point undercuts the argument that emergency amendment authority and immediate application of the new statutory penalties go hand-in-hand.

Petitioners finally appeal to the rule of lenity and the canon of constitutional avoidance.  But the rule of lenity has no application here, because the background principle supplied by §109 serves to remove the ambiguity that is a necessary precondition to invocation of the rule.  See *Deal* v. *United States*, 508 U. S. 129, 135 (1993).  The canon of constitutional avoidance also has no application here. Although many observers viewed the 100-to-1 crack-to-powder ratio under the prior law as having a racially disparate impact, see, *e.g.,* United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 8 (Apr. 1997)*,* only *intentional* discrimination may violate the equal protection component of the Fifth Amendment's Due Process Clause.  See *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 264–265 (1977); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 217 (1995).  There is thus no constitutional doubt triggered by application of the

prior mandatory minimums, much less the sort of "serious constitutional doub[t]" required to invoke the avoidance canon. *Clark* v. *Martinez*, 543 U. S. 371, 381 (2005).

\* \* \*

In the end, the mischief of the Court's opinion is not the result in this particular case, but rather the unpredictability it injects into the law for the future. The Court's decision is based on "[s]ix considerations, taken together," *ante,* at 11, and we are not told whether any one of these considerations might have justified the Court's result in isolation, or even the relative importance of the various considerations. One of them (the Commission's emergency authority to issue conforming amendments to the Guidelines) is a particular feature of the statute at issue in these cases, but another (the fact that applying the prior statutory penalties alongside the new Guidelines leads to a mismatch) is a general feature of a sentencing scheme that calibrates Guidelines ranges to the statutory mandatory minimums for a given offense. Are we to conclude that, after the Sentencing Reform Act, §109 has no further application to criminal penalties, at least when statutory amendments lead to modification of the Guidelines? Portions of the Court's opinion could be understood to suggest that result, but the Court leaves us in suspense.

That is most unfortunate, because the whole point of §109, as well as other provisions of the Dictionary Act, see 1 U. S. C. §§1–8, and the definitional provisions of the federal criminal law, see 18 U. S. C. §§5–27 (2006 ed. and Supp. IV), is to provide a stable set of background principles that will promote effective communication between Congress and the courts. In this context, stability is ensured by a healthy respect for our presumption against implied repeals, which demands a clear showing before we conclude that Congress has deviated from one of these background interpretive principles. Because the Court's

result cannot be reconciled with this approach, I respect-
fully dissent.